UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELIZABETH SAEZ,                    :
                                   :CIVIL ACTION NO. 3:16-CV-856
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI.  (Doc. 1.)  She originally alleged disability beginning on October 7, 2011, and later amended the onset date to October 15, 2012.  (R. 29.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Theodore Burock, concluded in his December 8, 2014, decision that Plaintiff's severe impairments of obesity, degenerative disc disease, headaches, depression, and left shoulder tendinitis and impingement did not alone or in combination meet or equal the listings.  (R. 31-33.) He also found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 33-37.)  ALJ Burock therefore found Plaintiff was not disabled.  (R.

38.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred when he found that Plaintiff's impairments did not meet or equal a listed impairment (Doc. 9 at 3); and 2) the ALJ failed to find Plaintiff disabled at step five of the evaluation process (*id.* at 9). After careful review of the record and the parties' filings, I conclude this appeal is properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB and SSI on October 15, 2012. (R. 29.) The claims were initially denied on January 30, 2013, and Plaintiff filed a request for a hearing before an ALJ on February 27, 2013. (*Id.*)

ALJ Burock held hearings on June 10, 2014, and August 22, 2014. (*Id.*) Plaintiff, who was represented by an attorney, testified and Vocational Expert ("VE") Michael Kibbler testified at the second hearing. (*Id.*) As noted above, the ALJ issued his unfavorable decision on December 8, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period. (R. 38.)

Plaintiff's request for review of the ALJ's decision was dated December 26, 2014. (R. 5-6.) The Appeals Council denied

Plaintiff's request for review of the ALJ's decision on November 6, 2015.  (R. 1-4.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On May 12, 2016, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on July 14, 2016.  (Docs. 7, 8.)  Plaintiff filed her supporting brief on August 25, 2016.  (Doc. 9.)  Defendant filed her brief on September 28, 2016.  (Doc. 10.)  Plaintiff did not file a reply brief and the time for doing so has passed.   Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on May 13, 1976, and was thirty-five years old on the alleged disability onset date.  (R. 37.)  Plaintiff has a high school education and has past relevant work as a home health aide, a food service manager, and a cashier.  (*Id.*)

**1.   <u>Impairment Evidence</u>**

On July 9, 2012, Plaintiff had an office visit at Southeast Lancaster Health Services ("SELHS") with Caroline Buckwalter, PA-C, for follow up on back pain, depression, and hypertension.  (R. 445-48.)  Plaintiff was ambulating with a cane and was scheduled for a nerve block later that week which, if unsuccessful, might indicate the need for a fusion.  (R. 447.)  She reported that her surgeon filled out paperwork for her to work twenty hours per week but that

was not helping much.  (*Id.*)  She also said that she was having trouble getting out of bed.  (*Id.*)  Regarding her depression, Plaintiff reported that she had just restarted Celexa because she had gotten insurance back the preceding week and she planned to return to the counselor she had seen previously.  (*Id.*)  Plaintiff requested a handicap placard and the paperwork was filled out.  (R. 447-48.)  The office notes were also signed by Rachel A. Eash Scott, M.D.  (R. 448.)

On October 15, 2012, Plaintiff had an office visit with Ms. Buckwalter.  (R. 435-39.)  Plaintiff reported that she needed to have FMLA forms filled out because her back surgeon wanted her to be out of work completely for the time being although her surgery had not yet been scheduled.  (R. 437.)  Plaintiff reported that her depression was unchanged, she had been taking Celexa but had been out of it for a while, and she had not yet set up counseling. (*Id.*)  Plaintiff was directed to continue Celexa and encouraged to set up counseling.  (*Id.*)  She was also advised to have the surgeon fill out the FMLA forms since he ordered her out of work.  (R. 438.)  Candice Cavicchia, M.D., also signed these office notes. (R. 439.)

On November 15, 2012, Plaintiff was admitted to Lancaster General Hospital fo L5-S1 posterior lumbar interbody fusion with an admitting diagnosis of low back pain with radiculopathy.  (R. 297.) Perry J. Argires, M.D., performed the surgery.  (*Id.*)  There were

4

no complications and Plaintiff was stable at discharge on November 19, 2012.  (*Id.*)  Operative Notes indicated that Plaintiff previously had a diskectomy and synoval facet cyst resection performed by another surgeon.  (R. 302.)

Plaintiff had an office visit at SELHS on December 10, 2012, with William Fife, M.D.  (R. 649-54.)  Plaintiff presented for evaluation of her chronic health problems and to determine if she qualified as disabled.  (R. 651.)  Dr. Fife noted that Plaintiff had been unable to work since her "significant back surgery and pain--she is still waiting to start PT and having significant pain and limitation of movement--using walker for very limited ambulation."  (*Id.*)  Regarding her back pain, he recorded "MA forms filled out--continue disability--pt. unlikely to be able to return to work for at least one year since onset of problem."  (R. 652.)  Plaintiff was noted to be alert and cooperative, with normal mood and affect, and normal attention span and concentration.  (*Id.*)  Dr. Fife reported that Plaintiff's depression was "improved."  (*Id.*)

On November 27, 2012, Plaintiff was seen for a post operative visit at Dr. Argires' office.  (R. 660.)  Plaintiff reported that she took pain medications twice a day and took Soma two to three times a day as needed.  (*Id.*)  She said her pain was improving, she was using a walker for ambulation, and her legs were weak.  (*Id.*)  It was recorded that Plaintiff was "[d]oing great post-op," and she

should continue her medications.  (R. 662.)

On December 14, 2012, Plaintiff was again seen for a post operative visit at Dr. Argires' office.  (R. 657.)  Notes indicate that Plaintiff complained of back pain and her right leg catching and she was taking MS Contin, Oxycodone, and Soma for pain control. (*Id.*)  It was reported that Plaintiff was doing well, she would refill medications as needed, and would return to the office in six weeks.  (R. 659.)

On December 17, 2012, Plaintiff had her initial physical therapy evaluation at The Rehab Center.  (R. 711.)  "General Information" indicates that Plaintiff had a lumbar laminectomy in November of 2011 which did not resolve her back problems and she received physical therapy but was discharged after eight visits due to lack of progress.  (*Id.*)  This section of the evaluation also notes that Plaintiff had the L5-S1 fusion a month earlier and the symptoms in her lower extremities had improved.  (*Id.*)  Plaintiff was not working at the time of the evaluation and presented with the chief complaint of pain--5/10 at best and 8/10 at worst.  (*Id.*) She also complained of occasional spasms in her lower back and both legs felt heavy at times.  (*Id.*)  Examination showed the following: the surgical scar appeared dry; knee extension was 5/5 bilaterally; knee flexion was +4/5 bilaterally; ankle dorsiflexion was +4/5 bilaterally; ankle plantarflexion was -5/5 bilaterally; ankle eversion was +4/5 bilaterally; toe extension was +4/5 bilaterally;

6

Plaintiff ambulated slowly with elastic back support and transitional movements were slow and guarded; reflex/sensory integrity was intact and equal bilaterally; and straight leg raise test was negative. (R. 711.) The "Assessment" indicated that Plaintiff would need skilled rehabilitative therapy in conjunction with a home exercise program and her overall rehabilitation potential was good. (R. 712.) Plaintiff tolerated the initial treatment/therapeutic activity with minimal complaints of pain and difficulty. (*Id.*)

Plaintiff had therapy sessions on December 18, 20, 27 and 31, 2012. (R. 714, 716, 719, 721.) Objective examination findings were unchanged from her initial evaluation and she generally tolerated the therapy with some complaints of pain and difficulty, fatigue, and heaviness in her legs after the treadmill. (*Id.*)

On January 25, 2013, Plaintiff saw Dr. James Argires because of back pain. (R. 1000.) He noted that the wound was healed nicely and Plaintiff continued to improve--"slow but definite." (*Id.*) He decided to stop land therapy and begin aquatic therapy. (*Id.*) Dr. Argires recorded that he did not find Plaintiff ready to return to gainful employment. (R. 1001.) He also commented that Plaintiff was still on medications and was "very judicious in the use of those medications." (*Id.*)

On February 4, 2013, Plaintiff was seen at SELHS for follow up on her back, hypertension and depression. (R. 857.) She reported

7

that she was doing "ok overall" but had occasional periods of feeling depressed and continued to experience back pain and problems related to FMLA paperwork, employment, and a handicap parking placard. (*Id.*) Regarding depression, she said did not take the Celexa previously prescribed because she was on so many other medications but she was interested in returning to counseling. (*Id.*) Regarding her back, she reported seeing her neurosurgeon on January 25, 2013, and he switched her from land therapy to aqua therapy which helped while she was actually doing it but the pain returned when it was over. (R. 859.) Records show that Plaintiff ambulated with a cane and had an antalgic gait, she was alert and cooperative with normal mood and affect and normal attention span and concentration. (R. 859-60.)

Plaintiff saw Dr. James Argires again on February 28, 2013, for a followup visit. (R. 994.) He noted that she had been treating with Thomas R. Westphal, M.D., (of the same office (*see*, *e.g.*, R. 659)) for her left shoulder impingement and that she was having difficulties with her lower back. (*Id.*) Dr. Argires commented that Plaintiff was not progressing as rapidly as he had hoped and he would extend the aquatic therapy program which seemed to be beneficial. (*Id.*) He planned for Plaintiff to continue her medications and for Dr. Westphal to address the impingement. (R. 995.) Regarding employment, Dr. Argires reported "we will keep her off work 1 more month, after which we may be able to release her to

go back at 4 hours a day as a dental assistant but we will see as to how she progresses." (*Id.*)  Examination showed that Plaintiff had negative straight leg raising and no gross motor or sensory deficit.  (*Id.*)

On March 8, 2013, Plaintiff saw Dr. Westphal for evaluation of her left shoulder.  (R. 987.)  He concluded that Plaintiff's left shoulder pain was probably due to chronic impingement with rotator cuff tendinopathy and possible tear and degenerative disc disease of the cervical spine.  (R. 988.)  He planned for her to modify her activity according to comfort level, continue her home exercise program (because formal therapy had not helped in the past), and order MRI.  (*Id.*)  She returned to Dr. Westphal on March 22, 2013, to review MRI results.  (R. 979.)  He found changes from her previous MRI and recorded the following impression: chronic impingement, left shoulder; asymptomatic AC joint osteoarthritis; subacromial bursitis; and rotator cuff tendinopathy.  (R. 979-80.) Dr. Westphal recommended that Plaintiff continue with therapy and, if symptoms persisted, she may want to consider arthroscopic subacromial decompression.  (R. 980.)

At her March 28, 2013, visit with Dr. James Argires, Plaintiff reported that her good days were increasing in number but she continued to have bad days with considerable discomfort.  (R. 972.) Dr. Argires deemed this progress satisfactory.  (*Id.*)  He noted that Plaintiff was taking Valium, Neurontin, and morphine tablets,

adding that "I am going to have to cut back on some of this medication after this next month." (*Id.*)  Dr. Argires planned to refer her to Dr. Simon for epidural injections to see if she responded to that form of treatment and commented that Plaintiff was "not quite ready to return to gainful employment." (*Id.*) Plaintiff had negative straight leg raising and no gross motor, sensory or reflex impairment. (*Id.*)

Plaintiff began therapy for her left shoulder at The Rehab Center on April 17, 2013, with the projected frequency and duration of three visits per week for one month. (R. 1085.)  On May 27, 2013, it was noted that Plaintiff self-discharged from therapy--she did not show up for appointments or call back. (R. 1080-81.)

Plaintiff saw Dr. Westphal on April 22, 2013, for her shoulder problem. (R. 964.)  He concluded that arthroscopic surgery was indicated because she failed conservative treatment and remained extremely symptomatic. (*Id.*)

On April 29, 2013, Plaintiff was seen for a preperative exam in anticipation of a left shoulder scope, subacromial decompression and repair scheduled for May 14, 2013. (R. 854.)  Plaintiff reported that she was still having a lot of back pain, was still doing physical therapy, had not been released to work, and had been sent back to pain management. (*Id.*)  Plaintiff was seeing a counselor once a week and said she had been having a lot of anxiety but had mixed feelings about starting medications because she was

already taking so many at the time.  (*Id.*)  Her "Current Medications" were Morphine Sulfate, Valium, Percocet, Gabapentin, Propranolol, Oscal, and Tens unit for shoulder pain.  (R. 853.)

Plaintiff was admitted to Lancaster General Hospital on May 14, 2013, for day surgery by Dr. Westphal.  (R. 736.)  Her preoperative and postoperative diagnosis was "[c]hronic impingement left shoulder, rotator cuff tendinopathy."  (R. 740.)  Dr. Westphal noted that a bursectomy was carried out and there were no complications.  (R. 741.)

Plaintiff was seen for surgical followup on May 22, 2013.  (R. 948.)  She was taking Oxycodone for pain and morphine for her back issues but reported that she was doing well and had some pain with movement.  (*Id.*)  Examination showed shoulder movement restricted "as expected," and strength was not assessed.  (R. 950.)

On May 29, 2013, Plaintiff was seen at SELHS for follow up of her care.  (R. 847-48.)  It was noted that she had shoulder surgery and was to start physical therapy that week and she was slowly starting to move the shoulder.  (R. 848.)  It was also noted that Plaintiff was seeing a counselor and was not taking psychiatric medications but felt she was doing ok.  (*Id.*)  Plaintiff reported that she was "laying around a lot" secondary to back and shoulder pain.  (R. 849.)

On June 21, 2013, Dr. Westphal found that Plaintiff had full range of motion, very little weakness, and no pain.  (R. 942.)  He

11

recommended that Plaintiff continue with her exercise program and take over-the-counter medication as needed. (*Id.*) Dr. Westphal noted that he estimated that it would take three to six months to reach full recovery. (*Id.*)

Plaintiff had a followup office visit with Dr. James Argires on July 15, 2013. (R. 934.) He recorded that Plaintiff was doing quite well, she had negative straight leg raising, and her pain was much improved with some days better than others. (*Id.*) Dr. Argires noted "I think we need a few more months of continued rehab at home, and I think this will get her ready to return to gainful employment. She is neurologically intact. Her work capability sheet was given to her." (*Id.*)

At her September 25, 2013, visit with Dr. James Argires, Plaintiff reported continued lower back pain radiating to her lower tail bone area. (R. 928.) Dr. Argires noted that Plaintiff "has not done well over the past several months" and ordered a repeat MRI. (*Id.*) He also noted that Plaintiff was ambulating with a cane, had negative straight leg raising, and no gross motor-sensory impairment. (*Id.*)

The October 9, 2013, lumbar spine MRI showed the following: "Interval posterior lumbar fusion of L5 and S1. There is a nonspecific material posterior to the intravertebral disc cage bilaterally which protrudes into the anterior epidural space where they abut the S1 nerve roots." (R. 1076.)

12

On October 17, 2013, Dr. James Argires reviewed the MRI with Plaintiff.  (R. 921.)  Office notes include a summary sent to Dr. Fife, Plaintiff's primary care physician.  (Id.)

> It appears that she has a considerable amount of degenerative changes at L5-S1 where the surgery was carried out.  I am not sure about the fluid collection or if that is part of the gel that is used with these particular procedures.  But she is a year out and I would rather think that there may be some fluid there.  I am going to suggest that we carry out a CT scan to be sure she does not have diskitis or a nonunion, and I am going to continue her medications, and I am going to have Dr. Perry Argires evaluate her after this is over. . . . Her wounds remain nicely healed.  She has negative straight leg raising, but she does have considerable paraspinal spasm, and some restriction in trunk flexion.  She likes to sit on her left side.

(R. 921.)

On October 18, 2013, Plaintiff went to the Emergency Department at Lancaster General Hospital because of back pain without focal numbness or weakness.  (R. 768.)  It was noted that her neurosurgeon was in the process of diagnostic testing related to her back pain.  (Id.)  Plaintiff reported her medications to be MS Contin, Gabapentin, Valium, and Oxycodone.  (Id.)  Plaintiff was given morphine which helped her pain, and she was discharged with directions to followup with her neurosurgeon the next day.  (R. 771.)

On November 28, 2013, Plaintiff had an office visit with Dr. Perry Argires to discuss surgical treatment options because

13

conservative measures had not helped her issues.  (R. 751.)  He noted that he had performed an interbody fusion at the L5-S1 segment in November 2012 and Plaintiff had done well until about four months before the November 28th office visit.  (*Id.*)  At that time she had developed right-sided buttock pain and was found to have a seroma formation causing more right-sided neural compression.  (*Id.*)  Examination showed that Plaintiff had no head, neck, EENT, cardiovascular, gastrointestinal, or extremity problems.  (R. 750.)  Neurologically she was found to be awake, alert and oriented, with clear and fluent speech, 5/5 motor examination throughout, and a steady gait.  (*Id.*)  Diagnostic studies reviewed included MRI imaging and CAT scanning which showed evidence of a seroma with neural compression.  (*Id.*)  Dr. Argires explained to Plaintiff that a small percentage of patients "develop this type of finding postop and lead to intractable sciatic type pain."  (*Id.*)  Plaintiff chose the surgical option presented by Dr. Argires.  (*Id.*)

At her preoperative examination on December 16, 2013, at SELHS, Plaintiff's examination was normal except for diminished patellar reflex on the right.  (R. 841-46.)  Plaintiff was found to be alert and cooperative with normal mood and affect, and normal attention span and concentration.  (R. 845.)

On December 23, 2013, Plaintiff was admitted to Lancaster General Hospital by Dr. Perry Argires for reexploration of

14

posterior lumbar wound and removal of epidural lesion based on a diagnosis of post fusion seroma with neural compression.  (R. 748-49.)  There were no complications and Plaintiff was discharged on December 24, 2013, in good and stable condition and was to follow up with Dr. Argires in one week.  (R. 749.)

Plaintiff returned to Dr. Argires' office on December 31, 2013, for her one-week surgical follow up appointment.  (R. 874.) Notes indicate that Plaintiff was doing well with decreased pain level; she stated that her right leg pain had improved and she felt most of her back discomfort was incisional pain.  (R. 875.) Plaintiff was noted to be walking without difficulty and taking MS Contin, Oxycodone and Valium.  (*Id.*)  It was recorded that neurological examination showed Plaintiff had normal strength and no sensory deficit.  (R. 877.)

On February 11, 2014, Plaintiff saw Jared Thatcher, PA-C, in Dr. Argires' office.  (R. 867.)  She had been referred by Dr. Fife, her primary care physician, after falling ten days earlier which resulted in increased back pain that extended into her leg.  (R. 868.)  Plaintiff reported that overall she had much improvement in her pain postsurgically and she felt strong in her lower extremities.  (*Id.*)  She described significant neck pain that extended into her bilateral shoulders with the left shoulder worse and pain extending down her left arm.  (*Id.*)  Plaintiff denied significant numbness or tingling or any weakness in the arms.

15

(*Id.*)  Examination showed that Plaintiff was strong in her upper extremities with sensorimotor intact in upper extremities bilaterally and equal.  (*Id.*)  Lower extremities were stronger without signs of sensory loss and no straight leg rise was appreciated.  (*Id.*)  The Assessment/Plan included a notation that the provider was pleased with her lumbar spine progress and her much improved post-surgical condition.  (*Id.*)  He added that "[s]he does use a cane for ambulation concerns, as she does feel that she is afraid of falling at times."  (*Id.*)  Physical therapy was discussed but Plaintiff wanted to hold off and discuss it at the next visit.  (*Id.*)  Regarding Plaintiff's neck complaints, a repeat MRI was ordered for comparison with the May 2012 MRI which showed a mild disc bulge at 4-5.  (*Id.*)  Regarding pain control, it was noted that Plaintiff was taking morphine and oxycodone and she was strongly urged to continue a taper process, especially of the morphine.  (R. 868-69.)

The repeat MRI performed on February 11, 2014, showed "[s]hallow right paramedian C4-5 disc herniation, unchanged.  No evidence of significant stenosis."  (R. 1078.)

Plaintiff saw Mr. Thatcher on April 4, 2014, for followup. (R. 1057.)  She reported that she continued to do well but had some intermittent pains in her lower back which extended down to her left lower extremity.  (R. 1057.)  She said the pain down the leg was only a minor concern.  (*Id.*)  She also said she continued to

16

take long-acting morphine and oxycodone as needed for pain control but she had tapered the morphine and would continue to do so. (R. 1057.) Plaintiff's main complaint at the office visit was her neck--reporting pain that extended down to her bilateral shoulders, worse on the left and extending down her left arm. (*Id.*) Mr. Thatcher confirmed that Plaintiff had a right paracentral disc herniation at C4-5 which was unchanged from the May 2012 study to the February 2014 MRI. (R. 1057.) Motor and sensory exam was normal, reflexes were normal, lower extremities were strong, and straight leg raise was negative. (*Id.*) Mr. Thatcher noted that the MRI showed no significant change from the previous study and he discussed several options with Plaintiff, recommending a continued therapeutic approach, continuing with the TENS unit, and doing aquatherapy. (R. 1058.)

On May 6, 2014, Plaintiff had an initial physical therapy evaluation at Lancaster General Health Suburban Outpatient Pavilion. (R. 1199.) With a listed diagnosis of left shoulder pain, sciatic RLE, and lower back pain, Plaintiff presented for aquatic therapy. (*Id.*) Notes contain the following "Assessment/Problem List":

> Physical impairments as follows: ROM, strength, pain, posture, functional endurance, gait, proprioception. Functional limitations as follows: ADLs, lifting, walking, prolonged standing, kneeling or bending to floor, prolonged sitting, climbing a flight of stairs, getting up from a low seat/sofa, driving an automobile, child care.

17

> She was referred for aquatic therapy, however
> had been performing aquatic exercises
> independently, therefore would only benefit
> from a few aquatic session [sic] to ensure
> proper technique /content of aquatic HEP, and
> would benefit from land based PT to improve
> core/LLE/UE strength and endurance.

(R. 1199.)  The plan was for Plaintiff to be seen two to three times per week for four weeks.  (R. 1200.)

The May 28, 2014, Discharge Summary directed to Dr. Argires indicates that Plaintiff was seen for four visits after her May 6, 2014, evaluation.  (R. 1209.)  She had two no-shows for her last two visits and four cancellations before that.  (*Id.*)  The Summary stated "Patient has not been compliant with treatment and home program.  Patient making poor progress toward goals, secondary to non-compliance.  Per this facility's cancellation/no-show policy, patient will be discharged."  (*Id.*)

On June 27, 2014, Plaintiff saw Mr. Thatcher at Dr. Argires' office.  (R. 1212.)  He noted that Plaintiff had improvement in her post-surgical pain and her main complaint was neck pain which was worse after therapy.  (*Id.*)  She was taking Oxycodone and MS-Contin on a routine basis for pain control, indicating this included for low back pain.  (R. 1212-13.)  Mr. Thatcher indicated that they discussed options including discontinuing therapy and obtaining EMG of the bilateral upper extremities regarding numbness and tingling as these symptoms were worse after therapy.  (R. 1212.)  Physical examination showed that sensorimotor was intact and equal in upper

18

and lower extremities, her strength was strong, and her gait was steady.  (*Id.*)

Plaintiff had nerve conduction studies on July 30, 2014, which were essentially normal.  (R. 1230-31.)  The Impression was "no definite electrodiagnostic evidence of a radiculopathy, plexopathy, or neuropathy affecting either upper extremity.  The mildly reduced left ulnar motor amplitude is a nonspecific finding of unlikely clinical significance when seen in isolation."  (R. 1231.)

On October 7, 2014, Plaintiff complained to Dr. Perry Argires of worsening neck pain and low back and right leg pain.  (R. 1238.) He planned to do studies to assess if there had been any changes since those which showed a small disc herniation at L5-6 and mild degenerative changes in her lumbar spine.  (*Id.*)

The cervical spine MRI done on October 13, 2014, showed no significant change since February 2014.  (R. 1246.)  It was negative for a disc herniation or canal stenosis, showed a slight annular bulge at C4-C5 slightly more to the right of midline, and a minor annular bulge at C5-C6.  (*Id.*)

The lumbar spine MRI of the same date showed the following:

> 1.  Postoperative changes at L5/S1 with some persistent T1 hyperintense material at the posterior disc margin and slightly protruding into the anterior epidural space, greater on the right.  A previous CT scan shows a thin bony capsule surrounding these collections.
>
> 2.  Mild to moderate central canal stenosis at L4/L5 with moderate left neural foraminal narrowing and mild right neural foraminal

> narrowing.  Bilateral inferior foraminal
> narrowing at L5/S1.  Multilevel facet
> degenerative changes.

(R. 1247-48.)

## 2.   Opinion Evidence

### a.   State Agency Opinions

Mark Hite, Ed.D., opined that Plaintiff's affective disorders were non-severe.  (*See*, *e.g.*, R. 80.)  He found that she had no restrictions of activities of daily living, no difficulties maintaining social functioning, no difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation.  (*See*, *e.g.*, R. 81.)

On January 29, 2013, State Agency Single Decision Maker Erin Gebhardt found it "reasonable to say that the claimant will be capable of sedentary work one year from the date of onset of her impairment."[1]  (*See*, *e.g.*, R. 84.)

### b.   Treating Physician Opinions

As set out above, Plaintiff had an office visit at Southeast Lancaster Health Services ("SELHS") on December 10, 2012, with

---

[1]   A single decision-maker ("SDM") is a non-examining, non-medical employee at the state agency level.  *Yorkus v. Astrue*, No. Civ. A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28. 2011). *Yorkus* cites "significant case law" and "the Agency's own policy" in concluding that a SDM's RFC assessment is not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level.  2011 WL 7400189, at *4 (listing cases and administrative documents).  The inclusion of SDM Gebhardt's findings is not intended to indicate that her RFC assessment was due any evidentiary weight.

William Fife, M.D.  (R. 649-54.)  Plaintiff presented for
evaluation of her chronic health problems and to determine if she
qualified as disabled.  (R. 651.)  Dr. Fife noted that Plaintiff
had been unable to work since her "significant back surgery and
pain--she is still waiting to start PT and having significant pain
and limitation of movement--using walker for very limited
ambulation." (*Id.*)  Regarding her back pain, he recorded "MA forms
filled out--continue disability--pt. unlikely to be able to return
to work for at least one year since onset of problem."  (R. 652.)

On January 25, 2013, Plaintiff saw Dr. Argires.  (R. 1000.)
He noted that the surgical wound was healed nicely and Plaintiff
continued to improve--"slow but definite."  (*Id.*)  Dr. Argires
recorded that he did not find Plaintiff ready to return to gainful
employment.  (R. 1001.)

Plaintiff saw Dr. Argires again on February 28, 2013, for a
followup visit.  (R. 994.)  Dr. Argires commented that Plaintiff
was not progressing as rapidly as he had hoped and noted "we will
keep her off work 1 more month, after which we may be able to
release her to go back at 4 hours a day as a dental assistant but
we will see as to how she progresses."  (R. 994-95.)

At her March 28, 2013, followup visit, Dr. Argires found
Plaintiff's progress satisfactory but noted she was "not quite
ready to return to gainful employment."  (R. 972.)

Plaintiff had a followup office visit with Dr. Argires on July

21

15, 2013.  (R. 934.)  He recorded that Plaintiff was doing quite well and noted "I thing we need a few more months of continued rehab at home, and I think this will get her ready to return to gainful employment.  She is neurologically intact.  Her work capability sheet was given to her."  (*Id.*)

3.   **Function Reports and Hearing Testimony**

Plaintiff completed a Function Report on November 30, 2012. (R. 257-66.)  Plaintiff said her impairments limited her ability to work because she is not able to stand, sit or walk for long periods of time and some days she cannot get out of bed.  (R. 257.)  She indicated that she had trouble sleeping because of pain, she needed assistance with some aspects of personal care and meal preparation, she did very little house and yard work, she needed help going places outside the house, and she shopped for groceries about twice a month.  (R. 258-60.)  Plaintiff noted that almost all postural activities and her ability to complete tasks were limited because of her impairments.  (R. 262.)  Plaintiff said she could walk for about fifteen minutes and would then need to rest for about ten minutes.  (*Id.*)  She also noted that she was using a cane, a walker and a brace--all prescribed by her doctor.  (R. 263.)  At the time Plaintiff's medications included Percocet, Propranolol, Gabapentin, Valium, Tramadol, morphine, and Soma with claimed side effects of drowsiness and sleepiness.  (R. 264.)  She described her pain as sharp constant pain, pinching pain, and numbness.  (R. 265.)

Plaintiff's relative, Malexi Robles, completed a Function Report the same date.  (R. 246-53.)  She indicated she had known Plaintiff for seventeen years and saw her daily to help take care of her.  (R. 246.)  Her responses were much the same as Plaintiff's.  (R. 246-53.)

At the June 10, 2014, ALJ Hearing, Plaintiff testified that she had throbbing intermittent pain in her shoulder, neck, and low back which was worse with exertion and she had numbness in both arms.  (R. 52-53.)  She said that she continued to take narcotic medications for pain and they made her sleepy and drowsy.  (R. 53.) She was going to physical therapy at the time for her neck, shoulder, and low back but she did not feel it was helping.  (R. 54, 60.)  She also said she was nervous and crying constantly as a result of her depression, and she did not want to leave the house at all.  (*Id.*)  Plaintiff indicated that Valium helped with the depression but it made her sleepy.  (R. 55.)

Plaintiff estimated that she could walk two blocks and then would have to sit down for five to ten minutes, she could stand for fifteen to twenty minutes, and she could lift no more than five pounds.  (R. 56.)  Plaintiff said she did nothing around the house--her children did all the chores with supervision.  (R. 57.)

When questioned by her attorney, Plaintiff testified that her back was better after her December 2013 surgery but she still had numbness and tingling in her leg and she had fallen on the stairs.

23

(R. 58.)  She said she had difficulty bathing because she could not lift her leg to get into the tub and had difficulty putting her shoes on.  (R. 60.)

Regarding her hands, Plaintiff reported that she had numbness and tingling, left worse than right, and she has dropped things because of it.  (R. 61.)

The ALJ tentatively closed the record without questioning the VE who was at the hearing.  (R. 62.)  He indicated that he may decide to hold the record open for records from Plaintiff's planned June 27th doctor visit.  (R. 60, 62.)

ALJ Burock held another hearing on August 22, 2014.  (R. 64.) He asked Plaintiff why she had not been compliant with physical therapy, and she responded that she had been in pain and the doctor said to discontinue it.  (R. 67.)

Plaintiff's attorney clarified that Plaintiff was not claiming that carpal tunnel was a severe impairment--it appeared that her symptoms were more the result of a cervical problem.  (R. 68.) Plaintiff testified that she had numbness and swelling of her hands which caused difficulty with buttons, opening things, and picking up things.  (R. 69-70.)  She noted that she continued to have difficulty with some aspects of personal care and she had fallen in the shower the previous week.  (R. 70-71.)  Plaintiff said she did not usually use the cane inside her house.  (R. 71.)

When asked why she stopped working at her last job, Plaintiff

responded that she tried to go back to work after surgery but she had a lot of pain, anxiety, and numbness in her legs as well as an inability to drive because of her medications. (R. 72.) She also said she was scheduled to see her surgeon again on October 7, 2014. (*Id.*)

ALJ Burock then asked VE Michael Kibbler to consider a hypothetical individual of the same age, education, and work experience as Plaintiff with a residual functional capacity for sedentary work, "[n]ot exertionally limited to routine, repetitive tasks with a GED of 1, 1, 1. Posturally limited to occasional . . . ramps and stairs, balance, stoop, kneel, crouch, and crawl. No ladders, ropes, scaffolding. No other hazards such as unprotected heights or dangerous equipment. No reaching above shoulder level bilaterally." (R. 74.) Mr. Kibbler indicated that such an individual could not perform past relevant work but there were jobs that existed in sufficient numbers in national, state, and local economies that she could perform such as table worker and final assembler. (R. 74-75.)

In the second hypothetical, ALJ Burock added "no constant use of the upper extremities bilaterally . . . so it would only be frequent." (R. 75.) Mr. Kibbler responded that the added limitation would not impact the jobs identified. (*Id.*)

When asked by Plaintiff's attorney whether there would be any effect if the individual were limited to only occasional use of the

upper extremities and that would be fingering, handling, and feeling, Mr. Kibbler responded that the jobs would be eliminated. (*Id.*)  He added that no other jobs would be available.  (R. 76.)

**4.   ALJ Decision**

As noted above, ALJ Burock issued his decision on December 8, 2014.  (R. 29-38.)  Findings of Fact and Conclusions of Law relevant to Plaintiff's claimed errors include his finding at step three that Plaintiff's severe impairments of obesity, degenerative disc disease, headaches, depression, and left shoulder tendinitis and impingement and her non-severe impairment of carpal tunnel syndrome did not alone or in combination meet or equal the listings.  (R. 31-33.)  The ALJ considered listing 12.04 which addresses affective disorders and concluded that Plaintiff did not meet or equal the listing but had mild restrictions in activities of daily living and moderate difficulties in concentration, persistence or pace.  (R. 32.)

Also relevant to Plaintiff's claimed errors is the ALJ's RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work . . . except as limited to routine repetitive tasks with a GED of 1, 1, 1 . . . .  She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. . . . She should not climb ladders, ropes, and scaffolds nor should she work around hazards such as unprotected heights or dangerous equipment. She should not reach above shoulder level

26

bilaterally.

(R. 33.)  In support of this determination, ALJ Burock reviewed the record and concluded Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible.  (R. 34.)  He gave great weight to the State Agency opinions regarding mental health issues and limited weight to the third-party opinion from Ms. Robles.  (R. 36.)  ALJ Burock noted that there was no state agency opinion regarding Plaintiff's physical disorders and he based the RFC on "the remainder of the record, including positive response to surgeries, the clinical and objective findings, and conservative care following her second back surgery."  (R. 36-37.)

With the established RFC, ALJ Burock found at step four that Plaintiff could not perform her past relevant work but at step five found there were jobs that existed in significant nubmers in the national economy that Plaintiff could perform.  (R. 37.)  The ALJ therefore found that Plaintiff was not disabled under the act.  (R. 38.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C.

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the

---

§ 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

28

fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 37-38.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

29

> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative

evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision

31

is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred when he found that Plaintiff's impairments did not meet or equal a listed impairment (Doc. 9 at 3); and 2) the ALJ failed to find Plaintiff disabled at step five of the evaluation process (*id.* at 9).

### A.   *Step Three Evaluation*

With her first claimed error, Plaintiff contends the ALJ erred at step three when he found that Plaintiff did not meet or equal listing 1.04 which addresses disorders of the spine.  (Doc. 9 at 4.)  Defendant responds that substantial evidence supports the ALJ's determination that Plaintiff did not satisfy the requirements of listing 1.04C.  (Doc. 10 at 4.)

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated
> nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative
> disc disease, facet arthritis, vertebral
> fracture) resulting in compromise of a nerve
> root (including the cauda equina) or the
> spinal cord.  With:
>
> A.  Evidence of nerve root compression
> characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is
> involvement of the lower back, positive
> straight-leg raising test (sitting and
> supine); or
>
> B. Spinal arachnoiditis, confirmed by an
> operative note or pathology report of tissue
> biopsy, or by appropriate medically
> acceptable imaging, manifested by severe
> burning or painful dysesthesia, resulting in
> the need for changes in position or posture
> more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in
> pseudoclaudication, established by finding on
> appropriate medically acceptable imaging,
> manifested by chronic nonradicular pain and
> weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404 Subpt. P App. 1.

Listing 1.04C requires that a claimant satisfy Section 1.00B2b which provides as follows:

> b.   What we mean by inability to ambulate
>      effectively.
>
> (1) Definition.  Inability to ambulate
> effectively means an extreme limitation of
> the ability to walk; i.e., an impairment(s)
> that interferes very seriously with the

33

individual's ability to independently
initiate, sustain, or complete activities.
Ineffective ambulation is defined generally
as having insufficient lower extremity
functioning (see 1.00J) to permit independent
ambulation without the use of a hand-held
assistive device(s) that limits the
functioning of both upper extremities.
(Listing 1.05C is an exception to this
general definition because the individual has
the use of only one upper extremity due to
amputation of a hand.)

(2) To ambulate effectively, individuals must
be capable of sustaining a reasonable walking
pace over a sufficient distance to be able to
carry out activities of daily living.  They
must have the ability to travel without
companion assistance to and from a place of
employment or school.  Therefore, examples of
ineffective ambulation include, but are not
limited to, the inability to walk without the
use of a walker, two crutches or two canes,
the inability to walk a block at a reasonable
pace on rough or uneven surfaces, the
inability to use standard public
transportation, the inability to carry out
routine ambulatory activities, such as
shopping and banking, and the inability to
climb a few steps at a reasonable pace with
the use of a single hand rail.  The ability
to walk independently about one's home
without the use of assistive devices does
not, in and of itself, constitute effective
ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third

Circuit Court of appeals emphasized that "'[f]or a claimant to show

his impairment matches a listing, it must meet all of the specified

medical criteria.  An impairment that manifests only some of those

criteria, no matter how severely, does not qualify.'"  *Id.* at 504

34

(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  *Jones* also stated that there is no particular language or format that an ALJ must use so long as there is "sufficient development of the record and explanation of findings to permit meaningful review."  *Id.* at 505.  Furthermore, as noted in *Hernandez v. Comm'r of Soc. Sec.*, 198 F. App'x 230, 235 (3d Cir. 2006) (not precedential), if the ALJ finds no documentation of required signs, there is nothing more he could have discussed and a plaintiff's complaint of inadequate discussion is without merit.

Plaintiff asserts that the severe medical issues in her lower back meet the criteria of Section 1.04C based on the medical records and diagnostic testing.  (Doc. 9 at 5 (citations omitted).) She further asserts that as a result of the back surgeries and pain she suffers from the following: "gait daily (R. 1199), has severe leg weakness (R. 660, 656, 753, 770, 935, 938, 1238), must ambulate with a cane (R. 859, 928), and has an ongoing history of persistent lower back pain (R. 656, 757, 855, 927, 928, 973, 1057, 1238)." (Doc. 9 at 6.)  Plaintiff also reviews limitations related to her neck problems and concludes that she has "provided clear and irrefutable proof [that she] meets the medical listing of Section 1.04(c) for her back and neck, which has resulted in her ability to ambulate effectively."  (*Id.* at 8.)

Defendant maintains that the record supports the ALJ's determination, including April 2014 records showing improved back

and leg pain (Doc. 10 at 9 (citing R. 17, 1057-58)), November 2012 and June 2014 records showing Plaintiff had a steady gait, and October 2015 MRI which confirmed postoperative degenerative changes and no more than mild to moderate canal stenosis at the L4-L5 level, mild neural foraminal narrowing, and multilevel degenerative changes (*id.* at 9, 10 (citing R. 913, 1212, 1248)).

Plaintiff did not file a reply brief and, therefore, does not refute Defendant's argument that she has not shown she meets *all* of the requirements of Section 1.04C.  By way of example, Plaintiff has not shown with her initial brief that she satisfies the Section 1.00B2b definition of ineffective ambulation in that ambulation with a single cane does not meet the criteria of the need for the use of an assistive device "that limits the functioning of both upper extremities" and she has not shown that her impairments prevent her from being able to engage in activities listed by example in the provision.  Thus, Plaintiff has not satisfied her burden of showing that the ALJ's claimed step three error is cause for reversal or remand.

**B.   *Step Five Determination***

Plaintiff maintains that the ALJ erred when he failed to find her disabled at step five of the evaluation process. (Doc. 9 at 9.) Defendant responds that the ALJ did not err at step five and Plaintiff's claimed error "essentially presents an attack on the RFC finding."  (Doc. 10 at 11 (citing *Rutherford v. Barnhart*, 399

36

F.3d 546, 554 n.8 (3d Cir. 2005)).)  The Court agrees that this claimed error is properly considered an attack on the RFC and further concludes that the ALJ erred in that he did not consider all probative evidence in formulating the residual functional capacity.

The Court's analysis and conclusion is guided by the recognized remedial nature of the statute.  The Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  606 F.2d at 406.  Further, the Court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

37

Though not specifically articulated by Plaintiff, the ALJ's failure to consider probative evidence leaves the Court unable to determine if his RFC is supported by substantial evidence.  As set out above, an ALJ must explain the weight given to all probative exhibits, *Dobrowolsky*, 606 F.2d at 406, and indicate why probative evidence has been rejected, *Cotter*, 642 F.2d at 706-07.

The Court's review of evidence shows that Plaintiff's primary care physician and treating neurologist opined that Plaintiff was not capable of gainful employment for certain periods of time.  (R. 651, 934, 994-95, 972, 1001.)  When considered in context, the period of time indicated by these opinions arguably extends from Plaintiff's alleged onset date to the time of her second surgery-- November 15, 2012, through December 24, 2013.

On December 10, 2012, Plaintiff's primary care physician, William Fife, M.D., noted that Plaintiff had been unable to work since her "significant back surgery and pain--she is still waiting to start PT and having significant pain and limitation of movement--using walker for very limited ambulation."  (651.)  He opined that it was unlikely that Plaintiff would be able to return to work for a year from the onset of her problem.  (R. 652.)  On January 25, 2013, Dr. James P. Argires noted that Plaintiff continued to improve--"slow but definite" but he  Dr. Argires recorded that he did not find Plaintiff ready to return to gainful employment.  (R. 1000-01.)  On February 28, 2013, Dr. Argires

38

commented that Plaintiff was not progressing as rapidly as he had hoped and noted "we will keep her off work 1 more month, after which we may be able to release her to go back at 4 hours a day as a dental assistant but we will se as to how she progresses." (R. 994-95.) On March 28, 2013, followup visit, Dr. Argires found Plaintiff's progress satisfactory but noted she was "not quite ready to return to gainful employment." (R. 972.) On July 15, 2013, Dr. Argires opined that he thought Plaintiff needed "a few more months of continued rehab at home, and I think this will get her ready to return to gainful employment." (R. 934.)

These explicit references to Plaintiff's inability to engage in gainful employment are supplemented by information of record that Plaintiff's condition did not improve after July 2013. On September 25, 2013, Dr. Thomas Argires noted that Plaintiff "has not done well over the past several months." (R. 928.) He ordered a repeat MRI which showed a seroma formation with neural compression which exacerbated symptoms and potentially required further surgery. (R. 921, 1076.)

On November 28, 2013, Dr. Perry Argires told Plaintiff that a small percentage of patients develop this type of finding after fusion surgery and it leads to "intractable sciatic type pain." (R. 752.) He performed the surgery on December 23, 2013, and Plaintiff was discharged without complications on December 24, 2013. (R. 748-49.)

39

This chronological review of treating physicians' opinions and findings arguably shows that they considered Plaintiff unable to work for more than one year--they deemed her post 2012 surgery recovery period ongoing and anticipated it would last "a few months" as of July 15, 2013, and two months later she was determined not to be doing well and found to have a post surgical complication which caused "intractable sciatic type pain" which required further surgery.  (R. 928, 934, 751, 1076.)  This evidence was not discussed by ALJ Burock and must be considered probative.[3]

Furthermore, this appears to be a case where Plaintiff's subjective complaints regarding her back pain cannot be minimized on the basis of negative straight leg raising and/or lack of motor-sensory impairment (*see* R. 35) in that her complaints were validated by diagnostic testing and were not accompanied by positive straight leg raising or gross motor-sensory impairment. (*See*, *e.g.*, R. 711, 752, 845, 928.)  Thus, a more detailed

---

[3] As noted in the review of evidence, on January 29, 2013, State Agency Single Decision Maker Erin Gebhardt found it "reasonable to say that the claimant will be capable of sedentary work one year from the date of onset of her impairment." (*See*, *e.g.*, R. 84.)  Pursuant to *Yorkus*, this opinion is not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level.  2011 WL 7400189, at *4 (listing cases and administrative documents).  However, because post surgical complications requiring further surgery extended Plaintiff's recovery period, SDM Gebhardt's determination made before the complications arose is not inconsistent with a conclusion that Plaintiff was unable to engage in substantial gainful activity for more than one year.

explanation supporting the ALJ's credibility finding is warranted.[4]

Based on the identified problems regarding the ALJ's RFC determination, the Court cannot conclude the RFC is based on substantial evidence.  Therefore, remand is required for further consideration.[5]

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this action.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: October 24, 2016

---

[4] Unlike Plaintiff's complaints of back pain, her complaints of neck and arm pain and related limitations are not similarly supported by diagnostic testing given the unchanged cervical spine MRI results from May 2012 (when Plaintiff was working) to February 2014 (R. 1078) and October 2014 (R. 1238) and essentially normal nerve conduction studies in July 2014 (R. 1231).  Although Plaintiff has not provided objective support for her upper extremity complaints and limitations beyond that found by ALJ Burock, the need for remand to reconsider the RFC should incorporate a more thorough analysis of this aspect of Plaintiff's claim and any potential connection between her lumbar problems and overall limitations.

[5] Because the ALJ based his RFC determination on his own assessment of the record (R. 36) and, as discussed in the text, Plaintiff's treating physicians' opinions are arguably at odds with his assessment, and because Plaintiff's history of back surgeries includes unusual complications (R. 752) and indications of new and/or worsening problems toward the end of the relevant period (R. 1238, 1247-48), expansion of the record, including consultative examination, may be warranted.